IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FLAVIO CAMERO,

    Petitioner,                      No. 1:05-cv-00034 ALA (HC )

    vs.

JOHN F. SALAZAR, Warden,[1]        ORDER

    Respondent.

_____/

Pending before the Court are Flavio Camero's ("Petitioner") "Petition for Writ of Habeas Corpus," filed pursuant to 28 U.S.C. §2254(a) on January 10, 2005; Respondent's "Answer to Petition for Writ of Habeas Corpus," filed on December 3, 2007; Petitioner's Traverse, filed on January 11, 2008; Respondent's "Supplemental Answer to Petition for Writ of Habeas Corpus," filed on February 28, 2008; and, Petitioner's "Notice of New Authority," filed April 24, 2008. For the reasons discussed below, Petitioner's application for a writ of habeas corpus pursuant to §2254(a) is denied.

**I**

**A**

---

[1] John F. Salazar is substituted for his predecessor, Mike Knowles, as the warden where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Petitioner was found guilty on May 7, 2001 by a jury in the Fresno County Superior Court of four counts of committing a lewd act upon a child under the age of fourteen pursuant to California Penal Code §288(a). He admitted the allegations in the accusatory pleading that he had served a prior prison term.

On July 10, 2001, the trial court sentenced Petitioner to an indeterminate prison term of fifteen years to life on count one pursuant to California's one-strike provision set forth in California Penal Code §667.71(b). He was also sentenced to serve fifteen years to life imprisonment on count two to be served concurrently with the sentence imposed on count one. The same sentence was imposed on counts three and four; however, the trial court's sentencing decision on these counts was stayed pursuant to California Penal Code §654.

**B**

Petitioner filed a district appeal from the trial court's judgment and sentence before the California Court of Appeal for the Fifth District. That court affirmed the trial court's judgment and sentence on February 18, 2003 in an unpublished opinion. On March 13, 2003, it denied Petitioner's petition for a rehearing.

Petitioner filed a petition for review of the California Court of Appeal's decision on April 1, 2003, before the California Supreme Court. That court denied the petition on May 14, 2003.

**C**

Petitioner filed a petition for a writ of habeas corpus before the California Supreme Court on April 1, 2003. The Court summarily denied the petition on December 15, 2004.

**D**

Petitioner timely filed the pending application for a writ of habeas corpus before this Court on January 10, 2005. (Doc. 1). On April 11, 2006, Respondent filed a motion to dismiss the application for failure to exhaust each of his claims (Doc. 10). On January 31, 2007, this Court granted Petitioner leave to withdraw his unexhausted claims. (Doc. 12). Petitioner filed a motion to withdraw his unexhausted claims (Doc. 13). This Court granted Petitioner's motion to

1  withdraw his unexhausted claims, and denied Respondent's motion to dismiss Petitioner's
2  application as moot. (Doc. 15). In its initial answer filed n December 3, 2007, Respondent
3  admitted that Petitioner has exhausted the remaining claims in the pending application before the
4  California's highest court (identified by Petitioner as claims one, three and seven).

## II

The California Court of Appeal summarized the facts presented at trial as follows in its unpublished decision in which it affirmed the judgment and sentence.

**Count One - Mercedes**

Twelve-year-old Mercedes testified that she and Tiffany, appellant's daughter, were best friends. Tiffany, who was 11 years old, lived with appellant, her sister, Monique, and her aunt, Irene. Tiffany's grandmother, Rosalie Sifuentez, operated a day care that Mercedes attended. Sifuentez was the foster mother to Raquel who also attended the day care and was friends with Tiffany and Mercedes.

On June 8, 2000, Mercedes spent the night with Tiffany at appellant's home. Monique was not home that night. Although the girls' room had two beds, Mercedes slept with Tiffany in Monique's bed because she felt uncomfortable sleeping alone at appellant's home. Appellant had hugged Mercedes and whistled at her in the past, which had made her uncomfortable. Due to the way she was feeling, she made sure to lock one of the bedroom's doors and close the other one before she went to bed. In addition, she slept next to the wall and had Tiffany sleep closer to the door. In the bedroom, over the bed, there was a hanging plant holder which was adorned with Christmas lights and shells. According to Mercedes, the lights were not very close to the bed; they were about an arm's length away.

During the night, Mercedes awoke to the feeling of someone rubbing her chest over her clothing. The rubbing went back and forth over her chest two to three times. The person then tried to reach under her shirt, but Mercedes rolled over knocking down a clock and the person stopped. The touching lasted about five seconds. Then the person adjusted the Christmas lights over the bed. When Mercedes looked up, she saw appellant leave the room.

After appellant left, Mercedes began to cry and awoke Tiffany. She told Tiffany what had happened and asked if she could call her mother. Tiffany said she could not. Mercedes had an upset stomach from dinner and went into the bathroom and vomited. When she returned, Tiffany suggested that they sleep in Irene's

3

room on the floor because appellant would not "do anything in there." The two children then moved to Irene's bedroom and went to sleep.

In the morning, appellant woke up Mercedes by pulling on her leg. He took the children to Sifuentez's day care in his truck. Mercedes insisted that Tiffany sit next to appellant on the drive over because she did not want to sit next to him. During the drive, appellant said that he had heard someone coughing in the night, and went in the bedroom to check on the girls. Upon entering the room he noticed that Mercedes was tangled in the Christmas lights and was turning purple. However, Mercedes testified that there were no Christmas lights on her when she awoke that night.

While at Sifuentez's, Mercedes called her mother and told her she had something to tell her, but Tiffany hung up the telephone. Tiffany became angry at her because she did not want Mercedes to tell anyone about what had happened. Then Tiffany told Sifuentez about the allegation Mercedes had made against appellant. Sifuentez became angry, called Mercedes names and told her that she and Raquel were both "bitches." Sifuentez sent all of the girls into a room. At that point, Raquel approached Mercedes and said she heard about what happened and stated that appellant had also touched her in the past.

Tiffany confirmed much of Mercedes's testimony. She stated that Mercedes had spent the night and slept in her bed next to the wall. She confirmed that there had been Christmas lights hanging approximately two feet above the bed. Mercedes woke Tiffany up in the middle of the night, scared and crying, and told Tiffany that appellant had touched her on her chest. Mercedes was not feeling well and went into the bathroom and vomited. Then the children spent the rest of the night in Irene's room. The next morning, appellant took them to Sifuentez's house. Tiffany saw Mercedes and Raquel talking and overheard Mercedes tell Raquel about the previous night's events. This angered Tiffany who then told Sifuentez about the allegation.

Mercedes's father, Richard G., testified that he picked Mercedes up from day care on the day in question. When he arrived, Sifuentez came out of the house yelling that Mercedes was a troublemaker and a liar. Mercedes was crying. Richard gathered up Mercedes and drove away. When he calmed Mercedes down, she told him that appellant had touched her on her chest the night before. Richard notified the police of the allegation.

Officer Jerry Smith interviewed Mercedes the day after the incident. Mercedes stated that she had spent the night at Tiffany's house and slept with Tiffany in the bed next to the wall. She explained how she had shut both doors, locking one, and slept next to the wall because appellant had made her feel uncomfortable in

4

the past. During the night, appellant entered and rubbed her chest over her clothing. This lasted for approximately one minute. She rolled over and he attempted to grab her breast area. When she rolled over, she knocked down a clock and appellant stopped, adjusted the chimes above the bed and left the room.

Mercedes also recounted how she had awakened Tiffany and then slept in Irene's room. In the morning, on the way to Sifuentez's house, Mercedes had Tiffany sit next to appellant. At the day care, Mercedes stated she told Raquel about the touching. Raquel stated the same thing had happened to her.

After speaking with Mercedes, Officer Smith interviewed appellant at his home. When he arrived, appellant stated he knew why Smith was there because Sifuentez had called him and told him about the allegation. Appellant stated that he had gotten home at 9:00 p.m. on the night in question, saw the girls briefly, and went to bed. He denied going into the girls' bedroom at all that night. Appellant then stated he did recall going into the room once because he could hear that someone was having a nightmare. According to appellant, he went into the room and unplugged the Christmas lights over the bed because he was concerned Mercedes would get tangled in the cords. He denied ever touching Mercedes that night.

Mercedes's mother, Marbella R., testified that she had received a call from Mercedes on the day in question. Mercedes told her she had to tell her something, and then said she would tell her later.

**Counts Two through Four - Raquel**

Raquel, who was 13 at the time of trial, testified that she was a friend of Tiffany and was the foster daughter of Sifuentez. She met appellant when she was nine years old. She recalled a time in 1997, when she was nine, where appellant touched her while they were in his apartment. Raquel had gone swimming with Tiffany and Monique at the pool at appellant's apartment complex. When they were finished, they went into appellant's apartment. Tiffany and Monique went into the bathroom and appellant had Raquel sit on his lap. While she was on his lap, appellant placed his hand on her vagina over her swimsuit, but did not move his hand. He kept his hand in place for approximately five minutes. She felt uncomfortable during the episode.

Officer Romo determined from official records that appellant lived in an apartment from September of 1997 until the following year. The apartment complex had a pool near appellant's unit.

After appellant moved into his house, Raquel often spent the night on the weekends. She estimated that she would spend about three weekends per month at appellant's home. When she visited, she

5

slept on the floor in Tiffany and Monique's bedroom. Every night Raquel slept at the house appellant would enter the room and either rub his hands over her breasts or touch her vagina over her clothing. The touching made her feel uncomfortable. Raquel recalled that appellant had also hugged her in a manner she did not like. When she was nine years old, appellant told her not to tell Sifuentez about the touching.

The last time appellant had touched Raquel was when she was in the sixth grade. He touched her in her private areas over her clothing. When Raquel found out that appellant had also been touching Mercedes, she told Mercedes about the times appellant touched her. When Sifuentez was told about the allegations, she did not believe the girls. Raquel told Sifuentez that she was just "messing around" because she knew Sifuentez would not believe them.

Raquel told her sister Rebecca about the touchings some time before Mercedes made her allegation. Sifuentez found out about this allegation and became very upset. Sifuentez stated that appellant "would never do such a thing."

Officer John Romo interviewed Raquel about her allegations. Initially, Raquel denied ever being touched by appellant. The officer felt she was withholding information and continued questioning her. He told Raquel that he knew she had told Mercedes that she had been touched and asked her what she had told Mercedes. She said that she told Mercedes that appellant had touched her "all over." These touchings occurred while she was sleeping in the bedroom when she was visiting Tiffany and Monique. She recalled the first time she was touched by appellant occurred when she was nine years old. Appellant touched her vagina and breasts while she was sitting on his lap. Appellant told her not to tell Sifuentez about what had happened. The last time she was touched was when she was 11 years old and occurred at appellant's house. She had been spending the night, and appellant touched her over her clothing while she slept. Raquel also stated that appellant would touch her every time she spent the night at his house. The touchings always occurred over her clothing.

**Defense case**

Tiffany, appellant's daughter, testified that Raquel never went swimming at appellant's apartment complex and could not recall there being a swimming pool in the complex. Tiffany also testified that on the night Mercedes claimed appellant touched her, she was sleeping in an upright position because she had an upset stomach. In that position she was within reach of the Christmas lights.

Sifuentez testified that she had known appellant, her ex-son-in-law, for 15 to 20 years. Raquel and Rebecca were her

6

|   |   |
|---|---|
| 1 | foster children for three years.  She stated that during the summer months she would take Tiffany, Monique, Raquel, Rebecca and |
| 2 | Mercedes swimming at a public pool.  She said she never took the girls to appellant's house after swimming; instead, they would go |
| 3 | home with her. |
| 4 | In May 2000, Monique and Rebecca told her that Raquel was making allegations against appellant.  Raquel told her she was just |
| 5 | "messing around."  Two weeks later, Mercedes made an allegation against appellant.  She did not reveal the information until she was |
| 6 | leaving and her father was honking his horn outside.  She followed Mercedes outside and tried to talk to her father, but he said he |
| 7 | would call the police and drove away.  Sifuentez denied ever telling the girls that she did not believe their allegations against |
| 8 | appellant and denied calling them names.  Despite her obligation to report instances of alleged sexual abuse, Sifuentez never |
| 9 | reported the allegations to the authorities. |
| 10 | According to Sifuentez, Raquel did not like to play with the other children.  If Tiffany and Mercedes got into a fight, then one of |
| 11 | them would play with Raquel to make the other one jealous. Sifuentez opined that Raquel liked this attention. |
| 12 |  |
| 13 | Sifuentez stated that sometime after Mercedes made her allegation Officer Romo interviewed her.  She stated that Romo was angry with her and became even angrier when she refused to say |
| 14 | anything derogatory about appellant. |
| 15 | Ten-year-old Adrian L. testified that he knew Mercedes from school.  He stated on one occasion, while standing in a line, he |
| 16 | turned around to punch Mercedes on the arm.  However, she turned as he swung and he accidentally struck her in the chest.  Mercedes |
| 17 | complained to an adult that he had touched her on a private part. |
| 18 | Flor M. was a friend of Mercedes until Mercedes began spreading rumors about Flor's mother.  Flor remembered Mercedes telling |
| 19 | her about the allegation against appellant. Mercedes said she had been sleeping at Tiffany's house and appellant touched her.  Flor |
| 20 | also recounted a time when Mercedes said that appellant may have touched her in the past, but she was unsure if the event happened |
| 21 | or if it was a dream. |

22 California Court of Appeal Unpublished Opinion in *People v. Camero*, Deft. MSJ, Ex.4 at 6.

### III

### A

On May 31, 2007, this Court granted Petitioner's motion to withdraw the following unexhausted claims: "(a) within ground two, the claims that counsel was ineffective for failing to

7

call particular witnesses and that counsel denied him a speedy trial; (b) ground four; (c) ground five and (d) ground six."  (Doc. 27).

In an order issued on February 19, 2008, this Court noted that

> the only claims still pending are those alleging the following grounds for relief:
> 1. Insufficient evidence to support the conviction (Ground I);
> 2. Ineffective assistance of counsel for counsel's failure to "object to overly detailed presentation of "'fresh complaint.'" (Ground 11(1));
> 3. Ineffective assistance of counsel for counsel's failure to request a limiting instruction concerning 'fresh complaint' evidence; (Ground II (2));
> 4. Failure to submit special verdict form to the jury (Ground III);
> 5. Unjustified imposition of life sentence (Ground III);
> 6. Sentencing judge's failure to exercise discretion and avoid application of 'one strike law' (Ground III);
> 7. Cruel and unusual punishment (Ground VII).

(Doc. 27).

**B**

In enacting the Antiterrorism and Effective Death Penalty Act, Congress has restricted the jurisdiction of federal courts in reviewing applications by state prisoners for relief from alleged violations of the United States Constitution.  Congress has decreed that

> "[a]n application for a writ of habeas corpus shall not be granted on behalf of a person in custody pursuant to the judgment of a state court unless the adjudication of the claim:
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

22 U.S.C. §2254(d).

Congress has also directed that "a determination of a factual issue by a state court shall be presumed to be correct.  The applicant [for a writ of habeas corpus] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. §2254(e)(1).

8

In reviewing an application for a writ of habeas corpus, a federal court is required to "make its determination as to the sufficiency of the state court findings from an independent or review of the record, or otherwise grant a hearing and make its own findings on the merits." *Turner v. Chavez*, 586 F.2d 111, 112 (9th Cir. 1978). When the state's highest court has summarily denied Petitioner's federal constitutional claims, a federal court must look through the state's highest court's decision and presume that it adopted the reasoning of the last state court that issued a reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 804-806 n.3 (1991).

Each of Petitioner's federal constitutional claims were presented to the California Court of Appeal in her direct appeal from the judgment and sentence. That court disposed of his claims in a reasoned opinion. Accordingly, because the California Supreme Court summarily denied his peition for review of his direct appeal to the Court of Appeal, and his state petition for a writ of habeas corpus, in reviewing his §2254(a) application, this Court must determine whether the analysis of his federal constitutional claims by the California Court of Appeal in its reasoned decision "was contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." §2254(d).

## IV

Petitioner was convicted of four counts of violating California Penal Code §288(a). Section 288(a) reads as follows:

> Any person who willfully and unlawfully commits any lewd or lascivious act including any of the acts constituting other crimes provided for in Part I, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passion, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years.

Petitioner argues that "because the touching in question [in each of the crimes alleged

against him] invoked the outer clothing of the child, . . . . such touching was [not] done in an inherently lewd manner, the acts alone do not suggest a specific lewd intent." Pet's Application at 11.

The California Court of Appeal rejected this federal constitutional claim. It held that

> [w]hether a touching is accompanied by an intent to arouse appeal to or gratify lust, passion, or sexual desire of the defendant or the child, must be decided on the facts of each case. This intent may be shown by circumstantial evidence. The circumstances of the present case demonstrate appellant acted with the requisite intent.

*People v. Camero*, No. F038546, 2003 Cal. App. Unpub. LEXIS 1574, at *15-16 (Cal. App. 5th Dist. 2003).

The California Court of Appeal noted that Mercedes testified Petitioner rubbed his hands over her chest and tried to reach under her shirt on one occasion. Petitioner told the police he did not touch her.

Raquel testified that Petitioner had repeatedly touched both her breasts and vagina over her clothing for about five minutes on several occasions when she spent the night at his house. Raquel testified that, when she was nine years old, he placed his hand on her vagina as she sat on his lap. This contact lasted approximately five minutes. Racquel also asserted that Petitioner told her not to tell Petitioner's daughter's grandmother about the incidents. The Court of Appeal reasoned that these circumstances were sufficient to support an inference that Petitioner acted with a lewd intent.

Petitioner maintains that "it is unreasonable to infer a lewd intent from mere touching." Pet's Application at 14. He further asserts that "where the touching is not inherently lewd, there should be something to prove a specific lewd intent." *Id*. This proposition is contrary to California law.

In *People v. Martinez*, 11 Cal. 4th 434 (1995), the California Supreme Court rejected a similar argument . The Court held that "the touching of an underage child is 'lewd and

lascivious' and 'lewdly' performed depending entirely upon the sexual motivation and intent with which it is committed." *Id.* at 449. The Court also concluded that nothing in the language of §288(a) "restricts the manner in which such contact can occur or requires that specific or intimate body parts be touched. Rather, a touching of 'any part' of the victim's body is specifically prohibited." *Id.* at 442.

The evidence regarding Petitioner's intent in this matter was disputed. The jury was persuaded that the victim's testimony was credible and that his guilt had been demonstrated beyond a reasonable doubt.

The California Court of Appeal's analysis of Petitioner's attack on the sufficiency of the evidence is faithful to relevant decisions of the United States Supreme Court. The Supreme Court held in *In re Winship*, 397 U.S. 358 (1970), that "[t]he Due Process Clause protects the accused against conviction except upon the proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id*. at 364.

As discussed above, the record shows that the prosecution produced evidence at trial that Petitioner violated §288(a) by committing lewd acts upon the body of two children under 14 years of age with the intent of arousing his lust, passion, or sexual desires. An accused's conviction is supported by sufficient evidence if "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Here, the evidence, when viewed in the light most favorable to the State, clearly demonstrated that Petitioner was guilty of violating §288(a) under California case law. Petitioner has failed to demonstrate that the state courts' rejection of Petitioner's federal constitutional claims constituted an objectively unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.

## V

Petitioner also maintains that his trial counsel ineffectively represented him at trial in

violation of the Sixth Amendment to the United States Constitution.  He argues that he was denied the effective assistance of counsel because of his failure to "object to overly detailed presentation of 'fresh complaints'."  Pet's Application at 19.  He also asserts that his counsel was ineffective in failing to request a limiting instruction regarding "fresh complaint evidence."[2]

In reviewing Petitioner's claim that his trial counsel was ineffective for failing to object to the fresh complaint testimony, the California Court of Appeal reasoned as follows:

> Appellant now argues trial counsel was ineffective for failing to object to the hearsay nature of the victims' statements to the officers.  We find counsel was not ineffective.  In order to sustain a claim of ineffective assistance of counsel, appellant must show that his trial counsel's performance fell below the standard of reasonableness and that there is a reasonable probability that the result would have been more favorable had his counsel provided adequate representation.  (*Strickland v. Washington* (1984) 466 U.S. 687, 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Bolin* (1998) 18 Cal.4th 297, 333, 956 P.2d 374.)  Appellant must also show that the omission was not the result of a reasonable tactical decision.  (*People v. Gurule* (2002) 28 Cal.4th 557, 611.)
>
> Appellant has not demonstrated that his failure to object to the evidence was the result of a reasoned tactical decision.  As the trial court pointed out in limine, the defense often has no intention of objecting to the statements made by the victims to the police and may use those statements as part of the defense.  At trial, defense counsel actively questioned the victims as well as the officers about the details of the statements made by the victims.  It was apparent that trial counsel was using the victims' statements to the police to point out inconsistencies in the victims' trial testimony.  Trial counsel argued that Raquel recanted her claim of molestation to Rosie, and pointed out that when she was initially questioned by

---

[2] In *People v. Brown*, 8 Cal. 4th 746 (1994), the California Supreme court defined the fresh-complaint doctrine as follows: [P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose-namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others-whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred.  Under such generally applicable evidentiary rules, the timing of a complaint (e.g., whether it was made promptly after the incident or, rather, at a later date) and the circumstances under which it was made (e.g., whether it was volunteered spontaneously or, instead, was made only in response to the inquiry of another person) are not necessarily determinative of the admissibility of evidence of the complaint.  Thus, the "freshness" of a complaint, and the "volunteered" nature of the complaint, should not be viewed as essential prerequisites to the admissibility of such evidence."  *Id*. at 949-50.

12

> Officer Romo, Racquel stated that nothing had happened. Defense counsel inquired into the details of what Mercedes told Officer Smith. He confirmed that she told the officer that the touching was over her clothing. In addition, he inquired into whether Mercedes had told the officer that Tiffany was jealous because she was talking to Raquel. In closing argument, counsel used the statements in the report to argue that the police failed to adequately investigate the charge. Based upon reading of the record, it is apparent that trial counsel did not object to the victims' statements to the police so he could use the statements to impeach the victims' credibility. Because there was a valid tactical reason for counsel's failure to object, counsel was not ineffective.

*Camero*, # ____ 2003 Cal. App. Unpub. LEXIS 1574, at *21-22.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Court instructed that in reviewing an ineffectiveness of counsel claim,

> [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955) (internal citation omitted).

After reviewing the record, it is clear to this Court that Petitioner has failed to overcome the strong presumption that his trial attorney's decision not to object to the evidence of fresh complaint, and not to request a limiting instruction, was sound trial strategy. The record supports the California Court of Appeal's conclusion that he did not do so because he chose to use the victim's statements to impeach their testimony based on the inconsistencies between their trial testimony and their fresh complaints. Petitioner has failed to demonstrate that this tactical choice, although unsuccessful, was not a reasonable trial strategy. Accordingly, the state

court's conclusion that Petitioner's counsel did not ineffectively represent him at trial was not an objectively unreasonable application of the Supreme Court's decision in *Strickland*.

### VI

Petitioner claims that the trial court erred in failing to submit a special verdict form to the jury requiring it to find that there were multiple victims. Petitioner argues that such a special finding by the jury is necessary under California Penal Code §667.61 before the court can impose a life sentence.

The California Court of Appeal rejected this contention as having been expressly waived by the parties. The court addressed this issue in the following words:

> Prior to trial the court stated that it would not provide the jury with a special verdict form regarding a multiple victim finding because it determined that such a finding would be superfluous; either the jury would return with guilty verdicts on counts against both victims or the section would not apply. Subsequently, the trial court stated that the parties had agreed that a special verdict would be unnecessary if the jury returned guilty verdicts on count one and any of the remaining counts. The parties expressly agreed with the trial court's statement.

The Court of Appeal rejected this claim because the parties expressly waived their right to request a special verdict. In *Johnson v. Zerbst*, 304 U.S. 458 (1938), the Supreme Court held that a fundamental constitutional right may be waived by a party. *Id*. at 464. Assuming that the claim is based on a violation of federal and not state law, the trial did not err in failing to submit a special verdict form to the jury, based on the parties' agreement that a finding of guilt on counts naming both victims would satisfy the multiple victim requirement. §667.61. The state court's ruling on this issue was not an objectively unreasonable application of federal law.

### VII

Petitioner also asserts that the trial court erred in failing to exercise its discretion not to impose a one-strike sentence because the prosecution failed to allege in the accusatory pleading that he was guilty of violating §288(a) against multiple victims.

The California Court rejected this claim. It reasoned as follows:

> Section 667.61, subdivision (e)(5), allows imposition of an increased sentence when the defendant is convicted of committing a lewd act against more than one victim. Prior to trial the court stated that it would not provide the jury with a special verdict form regarding a multiple victim finding because it determined that such a finding would be superfluous: either the jury would return with guilty verdicts on counts against both victims or the section would not apply. Subsequently, the trial court stated that the parties had agreed that a special verdict would be unnecessary if the jury returned guilty verdicts on count one and any of the remaining counts. The parties expressly agreed wit the trial court's statement. Appellant now argues, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348, that the trial court erred in refusing to give the special verdict form and reversal is required.
>
> We need not perform an extended *Apprendi* analysis. *Apprendi* held that the United States Constitution requires that any fact that increases the punishment beyond the prescribed statutory maximum must be submitted to the jury and proven beyond a reasonable doubt. (*Apprendi v. New Jersey*, *supra*, 530 U.S. at p. 490.) *Apprendi* was not offended in this case because the jury determined beyond a reasonable doubt that appellant had committed crimes against two victims.

The California Court of Appeal's conclusion did not unreasonably apply the United States Supreme Court's decision in *Apprendi*. The record shows that the jury found that Petitioner's crimes involved multiple victims. This Court also agrees with the California Court of Appeal that §667.61(I) does not require that a jury make a special finding that the crimes were committed against multiple victims. Assuming arguendo that the California Court of Appeal erred in holding that §667.61 does not require that the prosecution must plead that there were multiple victims, this Court lacks the authority under §2254(a) to rule on a claim that state law has been violated. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

## VIII

Finally, Petitioner argues that his sentence to life imprisonment was cruel and unusual punishment in violation of the Eight Amendment. The California Court of Appeal held that the trial court's sentence did not violate the Eighth Amendment. It analyzed this claim as follows:

> As for appellant's claim under the federal Constitution, the Eighth Amendment prohibits only extreme sentences that are "'grossly

disproportionate'" to the crime committed; there is no requirement of strict proportionality between crime and sentence (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001, 115 L. Ed. 2d 836, 111 S. Ct. 2680.) In *Harmelin*, the court rejected a disproportionality argument raised by Harmelin who, with no prior record, received a sentence of life without possibility of parole for possession of 672 grams of cocaine. (*Id.* at pp. 961-962, 996 (plur. opn. of Scalia, J.).) If Harmelin's sentence was not disproportional under the federal Constitution, given his lack of a prior record and that his offense involved no violence, then appellant can hardly contend that his sentence was cruel or unusual. While appellant's conduct was not violent, we note he committed four offenses against two victims, his crimes are likely to have a lasting effect on the victims who were in a position to trust him, and he has been previously convicted of a number of offenses, including offenses involving violence. Thus, his sentence of 15 years to life wit the possibility of parole is not "grossly disproportionate" and does not violate the Eight Amendment.

The United States Supreme Court held in *Solem v. Helm*, 463 U.S. 277 (1983) that "[r]eviewing courts, of course should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishment for crimes as well as the discretion that trial judges possess in sentencing convicted criminals." *Id.* at 90. The Ninth Circuit has held that "[g]enerally, as long as the sentence imposed upon the defendant does not exceed statutory limits, we will not overturn it on Eighth Amendment grounds." *United States v. Zavala-Serra,* 853 F.2d 1512, 1518 (9th Cir. 1988). Petitioner has failed to demonstrate that his sentence was grossly disproportionate.

## Conclusion

The state court's rejection of Petitioner's federal constitutional claims was not "contrary to, or involved an unreasonable application by the Supreme Court of the United States." U.S.C. §2254(d).

Accordingly, IT IS HEREBY ORDERED that

1. Petitioner's application for a writ of habeas corpus is DENIED.

2. The Clerk of Court is DIRECTED to enter judgment in favor of Respondent and close the case.

DATED: September 3, 2008

                                       /s/ Arthur L. Alarcón
                                       UNITED STATES CIRCUIT JUDGE
                                       Sitting by Designation